# EXHIBIT A

**STATE OF MINNESOTA**
**COUNTY OF CASS**

**DISTRICT COURT**
**NINTH JUDICIAL DISTRICT**

LEECH LAKE BAND OF OJIBWE,

        Plaintiffs,

vs.

3M COMPANY; BASF CORPORATION; THE
CHEMOURS COMPANY FC, LLC; CORTEVA, INC.;
DUPONT DE NEMOURS, INC; E.I. DU PONT DE
NEMOURS AND COMPANY; and TYCO FIRE
PRODUCTS, L.P.,

        Defendants

Case Type:  Property Damage/ Civil Other

Court File No.:

Judge:

**JURY TRIAL DEMANDED**

(1) PUBLIC NUISANCE;
(2) NEGLIGENCE;
(3) PRODUCT LIABILITY;
(4) UNJUST ENRICHMENT;
(5) FRAUDULENT TRANSFER;
(6) COST RECOVERY UNDER MERLA

- 1 -

## TABLE OF CONTENTS

Page

NATURE OF THE ACTION ................................................................................................. 3

JURISDICTION AND VENUE ........................................................................................... 7

PARTIES .............................................................................................................................. 7

I.      Plaintiff ........................................................................................................... 7

II.     Defendants ....................................................................................................... 8

        A.      3M ........................................................................................................ 9

        B.      The DuPont Defendants ..................................................................... 10

        C.      Other Defendants ............................................................................... 12

ALLEGATIONS COMMON TO ALL CAUSES OF ACTION ....................................... 14

FACTUAL ALLEGATIONS ............................................................................................. 14

        A.      PFAS Definition, Properties, and Products......................................... 14

        B.      PFAS are Harmful to Human Health .................................................. 17

        C.      Defendants' Knowledge...................................................................... 18

        D.      PFAS Regulatory Framework ............................................................. 20

        E.      PFAS Contaminate the Environment .................................................. 28

CAUSES OF ACTION ...................................................................................................... 39

COUNT I – PUBLIC NUISANCE (MINN. STAT. § 561.01)........................................... 39

COUNT II – NEGLIGENCE ............................................................................................. 41

COUNT III – PRODUCT LIABILITY .............................................................................. 43

COUNT IV – UNJUST ENRICHMENT ........................................................................... 44

COUNT V – FRAUDULENT TRANSFER (AGAINST THE DUPONT
        DEFENDANTS) (MINN. STAT. § 513.44)....................................................... 45

COUNT VI – COST RECOVERY UNDER MERLA (AGAINST 3M) (MINN. CH.
        115B).................................................................................................................. 46

PRAYER FOR RELIEF .................................................................................................... 47

DEMAND FOR JURY TRIAL .......................................................................................... 49

3325458.1

Plaintiff, THE LEECH LAKE BAND OF OJIBWE, by and through counsel, alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff Leech Lake Band of Ojibwe (the "Band") is a sovereign Indian tribe located in north-central Minnesota.  The Band is one of six federally recognized sovereign bands making up the federally recognized sovereign Indian nation, the Minnesota Chippewa Tribe.

2.     The Band occupies and governs the Leech Lake Reservation (the "Reservation"), which was established by the Treaty of 1855 with the Chippewa, 10 Stat. 1165, Feb. 22, 1855. The Reservation spans Beltrami, Cass, Itasca, and Hubbard Counties.  The Band's ancestral territory extends well beyond the Reservation with traditional villages and sacred sites throughout northern Minnesota.  While most of its members live on the Reservation, approximately one-third of the Band's members reside in the Twin Cities metropolitan area and additional members reside in Duluth or elsewhere in St. Louis County, Minnesota.  Regardless of location, the Band is responsible for the health and well-being of its members.  Many members rely on the Band for governmental services, including, among others, health care, education, public works, resource management, social services, and judicial services.

3.     The Band's identity and existence are inextricably linked to the resources of the Reservation. The Reservation is named for one of Minnesota's largest lakes, Leech Lake. Hundreds of small natural rivers, lakes, aquifers, and the Mississippi River sustain the Band's members.  The 270 fishable lakes and over 860,000 acres of land within the Reservation remain rich in cultural and economic resources.  The Band's rights to hunt, fish, and gather on the Reservation are reserved by treaty, *see Leech Lake Band of Chippewa Indians v. Herbst*, 334 F. Supp. 1001, 1006 (D. Minn. 1971) (citing *Menominee Tribe of Indians v. United States*, 391 U.S.

404 (1968)), and depend on the health and availability of natural resources that support those

activities. The Constitution of the Minnesota Chippewa Tribe ("MCT Constitution") gives each

member band authority to protect and preserve its natural resources. The Band's members rely

on white-tailed deer, fish, and wild rice for subsistence and cultural and religious practices that are

central to their way of life. These Reservation resources are connected through natural processes

with the natural resources that surround the Reservation, including those found on or adjoining the

Band's off-reservation lands. The Band's culture and traditions depend on the Reservation's land

and water resources, as well as off-reservation water and natural resources that are connected to,

or are accessible from the Band's Reservation and the Band's other lands. Furthermore, fishing,

hunting, agriculture (including the gathering of wild rice), and tourism are also essential economic

industries on the Reservation and the Band's ceded territory, that support the Band's self-

sufficiency and economic development. As such, the Band owns and operates several

governmental programs related to conserving these industries, including the cultivation of wild

rice, protection and enhancement of local fisheries, and conserving forests and fauna through its

Forestry Department, Plant Resources Program, wildlife monitoring, habitat management

programs, and Ojibwe Fisheries.

     4.    However, manmade chemicals known as per- and polyfluoroalkyl substances

("PFAS") have contaminated the Leech Lake Reservation. Once introduced into the environment,

PFAS are persistent in nature, meaning that it takes a very long time for natural processes to break

them down. They are extremely water-soluble, meaning that they easily travel through natural

watersheds and man-made water systems, and through the food chain. PFAS also bioaccumulate

in animals or people who consume water or food that contain PFAS, meaning that the amount of

PFAS in the body increases over time. This is all of great concern to the Band because studies

have shown that higher rates of PFAS contamination in the body correlate with serious terminal illnesses, such as heart diseases and cancers. In addition, the presence of PFAS threatens the Band's resources, economic viability, political integrity, and human health.

5. In order to evaluate the potential impact that PFAS could have on its members and resources, the Band has repeatedly tested its Reservation resources for PFAS. The results have been alarming.

6. In 2022, the Band participated in voluntary PFAS testing of its eleven public drinking water systems. This testing revealed the presence of toxic PFAS levels in drinking water supplying the Band's Bug-O-Nay-Ge-Shig School, a pre-K through 12th grade tribally-controlled Bureau of Indian Education ("BIE") school. The Band immediately ceased use of the school's public water system. Today, the Band continues to supply bottled water to the school.

7. In 2023, the Band planned to revise its fish consumption advisory, a community resource which recommends safe levels of consumption of certain fish species to its members. In anticipation of these revisions, and aware of the presence of PFAS on the Reservation, the Band tested six species of fish from two reservation lakes: Cass Lake and Pike Bay. In nearly all species of fish in both lakes, testing revealed toxic levels of PFAS—namely Perfluorooctanoic acid ("PFOA"), Perfluorooctanesulfonic acid ("PFOS"), Perfluorhexanoic acid ("PFHxA"), Perfluorobutanoic acid ("PFBA"), Perfluoroheptanoic acid ("PFHpA"), Pentafluorbenzcic acid ("PFBA"), 4-Hydroxybenzoic acid ("PHBA"), Perfluorononanoic acid ("PFNA"), and Perfluoroundecanoic acid ("PFUnA"). The tests found that walleye, white fish, perch, and pike, all of which are essential to the diets of the Band's members, are contaminated with these PFAS chemicals.

8.  The Band also tested water from Cass Lake and Pike Bay. The tests showed these lakes contain PFOA, PFBA, PFHxA, and PFHpA.

9.  In 2025, the Band conducted further sampling and tested livers from twenty-two deer. All samples contained PFBA, and two samples contained PFOS. Left unaddressed, these PFAS levels in a critical food and cultural resource will have negative impacts on the Band and its members.

10.  The lakes and fish identified above are essential to the Band's tourism and aquatic-dependent resources. The Band must now expend substantial resources to investigate the scope of PFAS contamination to the extent it is not already known, mitigate the effects of PFAS contamination, and reduce and eliminate the presence of PFAS in its resources. The presence of PFAS in the Reservation's resources means that the Band's members are exposed to this contamination. Additionally, as a result of the contamination identified in these resources, the Band must now take steps to identify, prevent, and mitigate PFAS contamination of other resources within the Reservation and the Band's other lands, such as private and public drinking water wells, wild rice, soil for agriculture, and many other lakes and rivers. The Band must also identify, prevent, and mitigate the impacts of PFAS contamination to off-reservation resources that have or could migrate onto the Reservation or the Band's other lands.

11.  Defendants are the researchers, developers, designers, manufacturers, marketers, releasers, promoters, sellers, and/or distributors of PFAS and/or products containing or resulting in PFAS. PFAS chemicals attributable to defendants' actions or inactions are found in resources nationwide. The presence of PFAS within the Band's Reservation that are attributable to Defendants' products, designs, or activities threatens the health, welfare, and rights of the Band and its members. Thus, the Band brings this action against the Defendants to advance and protect

the health, safety, and welfare of the Band's members, the Band's treaty rights, and to restore the Reservation's natural environment.

12.     The Band seeks to recover costs associated with: testing and remediation of PFAS chemicals in the Band's ground and surface water, including costs associated with treating or replacing drinking water contaminated with PFAS, replacing infrastructure contaminated by PFAS, remediation of soil and other natural resources, restoration of tribal fisheries, conducting studies, costs to the Band associated with health impacts to tribal members, and medical monitoring of Tribal members for harms associated with PFAS exposure.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction because the Defendants conduct business in Minnesota and intentionally avail themselves of markets within Minnesota to conduct business, and because the acts and omissions giving rise to this action occurred in substantial part in Minnesota.

14.     Venue is proper in Cass County because the Defendants conduct business in this County and because the acts and omissions giving rise to this action occurred in substantial part in this County.

## PARTIES

### I.     Plaintiff

15.     Plaintiff Leech Lake Band of Ojibwe is a federally recognized sovereign Indian Tribe with approximately 10,000 enrolled tribal members.  The Band's governing body is the Leech Lake Reservation Business Committee, also known as the Leech Lake Band of Ojibwe Tribal Council.  The Leech Lake Reservation encompasses over 860,000 acres, sharing geography with four counties—Cass, Itasca, Beltrami, and Hubbard—in north-central Minnesota.  The Band owns land in fee simple on and outside of its Reservation.  The United States federal government owns and holds land in trust for the benefit of the Band within and outside of its Reservation.

3325458.1

Much of this land adjoins lakes, ponds, rivers, streams, and wetlands, the waters of which the Band and its members make reasonable uses including by hunting, fishing, gathering wild rice, swimming, recreating, and spiritual and ceremonial activities in and on those waters. Members of the Band affected by Defendants' conduct described in this complaint live on the Band's Reservation, as well as throughout Minnesota.

16.　　The headquarters of the Leech Lake Band of Ojibwe's Tribal government is located on the Reservation in the City of Cass Lake.

17.　　The Leech Lake Band of Ojibwe Tribal Council has inherent sovereign governmental authority and responsibility to safeguard and promote the general welfare of its members, maintain justice for its members, and to promote the conservation and development of its Reservation and other lands as reflected in the MCT Constitution.

18.　　Nothing within this complaint shall be deemed a waiver of the Band's sovereign immunity.

19.　　The health and environmental crisis that Defendants caused strains the Band's ability to provide adequate services to its members. With its limited resources, the Band has diverted funds from other Tribal priorities to provide staff, services, and programs needed to address PFAS contamination, including PFAS testing of deer, fish, surface water, and ambient air, revisions to health advisories and consumption guides, investigations into contamination of the Bug-O-Nay-Ge-Shig School and drilling of a new water system, and providing medical care for Tribal members suffering from PFAS-related health impacts.

## II.　Defendants

20.　　The term "Defendants" refers to all Defendants named herein jointly and severally in paragraphs 22-30, *infra*. At times relevant to this action, the following Defendants researched, developed, designed, manufactured, marketed, released, distributed, promoted, and/or sold

(directly or indirectly) and/or assumed or acquired liabilities for the manufacture and/or sale of: (a) PFAS; (b) the chemical precursors of PFAS; (c) PFAS Products (as defined in paragraph 39, *infra*, which include, but are not limited to, industrial, commercial, and consumer products) containing PFAS and/or the chemical precursors of PFAS; and/or (d) AFFF (as defined in paragraph 22, *infra*).

21.    Defendants designed, manufactured, formulated, marketed, promoted, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of PFAS Products that have contaminated, and continue to contaminate the Leech Lake Band of Ojibwe's Reservation.

A.    **3M**

22.    Defendant **3M Company (3M) f/k/a Minnesota Mining and Manufacturing Co.** is a Delaware corporation with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.  3M is headquartered in Maplewood, Minnesota.  3M is registered to do business in the State of Minnesota and 3M owns and operates facilities in Minnesota.  3M's registered agent is Corporation Service Company located at 2780 Snelling Avenue N, Suite 101, Roseville, Minnesota 55113.  3M manufactured, distributed, and sold PFAS Products including the production and sale of aqueous film-forming foam ("AFFF").  AFFF is a firefighting agent used to control and extinguish flammable liquid fires, such as petroleum-fueled fires.  Developed in the 1960s, AFFF historically was and is still presently used at sites such as military bases, airports, petroleum refiners, and fire training centers.  3M was the sole producer of PFOS, which it made using an Electro-Chemical Fluorination method (ECF), for which it sought intellectual property rights.

3325458.1

### B.    The DuPont Defendants

23.    This complaint refers to Corteva, Inc., E.I. du Pont de Nemours and Company, DuPont de Nemours, Inc., formerly known as DowDuPont Inc., and The Chemours Company FC, LLC, collectively as **"the DuPont Defendants**."

24.    Defendant **Corteva, Inc. (Corteva)** is a Delaware corporation with its principal place of business located at 974 Center Road, Wilmington, Delaware 19805. Corteva's registered agent is C T Corporation System Inc. located at 1010 Dale Street North, St. Paul, Minnesota 55117. Corteva acquired liabilities in Minnesota relating to E.I. du Pont de Nemours and Company's research, development, manufacturing, design, marketing, distribution, release, promotion, and/or sale of PFAS and/or PFAS Products.

25.    Defendant **E.I. du Pont de Nemours and Company (Old DuPont)** is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont is currently a wholly owned subsidiary of Defendant Corteva, defined above. Old DuPont has done business throughout the United States, including conducting business in Minnesota. Old DuPont has been involved in the production and sale of PFAS Products since the 1950s. When 3M left the AFFF market in 2002, Old DuPont took on a larger role in that market. Old DuPont researched, developed, manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold PFAS and/or PFAS Products in markets around the United States, including within Minnesota.

26.    Defendant **DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.)** (**New DuPont**), is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. New DuPont does business throughout the United States, including in Minnesota. New DuPont assumed liability for Old DuPont's PFAS contamination, including in Minnesota. On June 1, 2019, New DuPont—the surviving corporation after a spin-off from

- 10 -

Defendant Corteva and another entity known as Dow, Inc.—changed its name to DuPont de Nemours, Inc.  Following the spin-off, New DuPont retained assets in the specialty products business lines and assumed the financial assets and liabilities remaining from Old DuPont that were not assumed by Corteva.  New DuPont acquired liabilities relating to E.I. du Pont de Nemours and Company's research, development, manufacturing, design, marketing, distribution, release, promotion, and/or sale of PFAS and/or PFAS Products in Minnesota.  Prior to taking its current corporate form on June 1, 2019, New DuPont, through the businesses that it owned and operated, and those owned and operated by its subsidiaries, had a decades-long history as a chemicals company, among other things.

27.    Defendant **The Chemours Company FC, LLC (Chemours)** is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.  Chemours was incorporated as a subsidiary of Old DuPont as of April 30, 2015.  From that time until July 1, 2015, Chemours was a wholly owned subsidiary of Old DuPont.  Chemours is a successor in-interest to DuPont Chemical Solutions Enterprise, and it conducts business in Minnesota.  On July 1, 2015, Old DuPont de Nemours and Company spun off Chemours and transferred to Chemours its "performance chemicals" business line, which includes its PFAS Products business, distributing shares of Chemours stock to Old DuPont stockholders, and Chemours has since been an independent, publicly traded company.[1]  As part of the spin off, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend and a distribution in kind of promissory notes, totaling approximately $3.9 billion.  Chemours funded these distributions by entering into financing transactions prior to the July 1, 2015 transaction date

---

[1] E.I. du Pont and The Chemours Company, *June 26, 2015 Separation Agreement*, https://www.sec.gov/Archives/edgar/data/30554/000003055415000065/exhibit21separationagreeme.htm.

and then distributed approximately $3 billion in common stock to Old DuPont shareholders. Therefore, most valuable assets owned by Chemours at the time of the spin off became unavailable to creditors with current or future PFAS claims. In addition to the assumption of Old DuPont's liabilities, the separation agreement between Chemours and Old DuPont required Chemours to indemnify the latter in connection with these liabilities.[2] The indemnification is uncapped and does not have a survival period.[3]

28. Chemours has received and begun manufacturing certain product lines from Old DuPont, including some product lines involving marketing, manufacturing, sales, promotion, and distribution of PFAS-containing intermediates and PFAS Products. In addition, Chemours acquired liabilities relating to Old DuPont's research, development, manufacturing, design, marketing, distribution, release, promotion, and/or sale of PFAS and PFAS Products in Minnesota.

## C.    Other Defendants

29. Defendant **BASF Corporation (BASF)** is a Delaware corporation with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932. BASF is registered to do business in Minnesota. BASF's registered agent is C T Corporation System Inc. located at 1010 Dale Street N, St. Paul, Minnesota 55117. BASF is the successor in interest to Ciba Inc. (f/k/a Ciba Specialty Chemicals Corporation). BASF researched, developed, manufactured, designed, marketed, distributed, promoted, and/or otherwise sold PFAS and/or PFAS Products in markets around the United States, including within Minnesota. Namely BASF researched, developed, manufactured, designed, marketed, released, distributed, promoted, and/or otherwise sold Ultramid and Ultradur, which are injection molding materials containing PFAS.

---

[2] *Id*.

[3] *Id*.

30.     Defendant **Tyco Fire Products, L.P. (Tyco)** is a limited partnership formed in Delaware with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Tyco is registered to do business in Minnesota. Tyco's registered agent is C T Corporation System Inc. located at 1010 Dale Street N, St. Paul, Minnesota 55117. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International PLC. Tyco is the successor-in-interest of the Ansul Company (Ansul), having acquired Ansul in 1990 (Ansul and Tyco, as the successor-in-interest to Ansul, will hereinafter be collectively referred to as Tyco/Ansul). Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained PFAS. After Tyco acquired Ansul in 1990, Tyco/Ansul researched, developed, manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold PFAS and/or PFAS Products, including AFFF, in markets around the United States, including within Minnesota.

31.     Whenever reference is made in this complaint to any act of any Defendant or Defendants, the allegation shall mean that the Defendant or Defendants did the acts alleged in this complaint either personally or through the Defendant's or Defendants' officers, directors, employees, agents and/or representatives acting within the actual or ostensible scope of their authority.

32.     Each Defendant committed the acts, caused or directed others to commit the acts, or permitted other Defendants to commit the acts alleged in this complaint. Additionally, some or all of the Defendants acted as the agents of the other Defendants, and all of the Defendants acted within the scope of their agency if acting as an agent of another Defendant.

33.     All of the conduct that forms the basis for this complaint has been undertaken by Defendants by and through their agents, employees, officers, or others acting on their behalf.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

## FACTUAL ALLEGATIONS

### A.  PFAS Definition, Properties, and Products

34.  <u>Definition</u>.  PFAS are a class of human-made substances consisting of thousands of different chemicals.  The term "PFAS" used in this complaint refers to the following per- and polyfluoroalkyl substances (along with their salts and structural isomers): (i) PFOA including but not limited to, the chemical expressly identified by Chemical Abstract Services Registry (CASR) as perfluorooctanoic acid (CASR Number: 335-67-1); (ii) PFOS including but not limited to the chemical expressly identified by CASR as perfluoooctanesulfonic acid (CASRN: 1763-23-1); (iii) PFBA including but not limited to the chemical expressly identified by CASR as perfluorobutanoic acid (CASRN: 375-22-4); (iv) PFUnA including but not limited to the chemical expressly identified by CASR as perfluoroundecanoic acid (CASRN: 2058-94-8); (v) PFHxA including but not limited to the chemical expressly identified by CASR as perfluorohexanoic acid (CASRN: 307-24-4); (vi) PFHpA including but not limited to the chemical expressly identified by CASR as perfluoroheptanoic acid (CASRN: 375-85-9); (vii) PFNA including but not limited to the chemical expressly identified by CASR as perfluorononanoic acid (CASRN: 375-95-1); (viii) hexafluoropropylene oxide dimer acid (HFPO-DA) (GenX chemicals) (CASRN: 13252-13-6); (viii) perfluorohexanesulfonic acid (PFHxS) (CASRN: 355-46-4 533); (viv) perfluorononanoic acid (PFNA)  (CASRN 375-95-1); (x) perfluorobutanesulfonic acid (PFBS) (CASRN 375-73-5); (xi) perfluorobutanoic acid (PFBA) (CASRN 375-22-4); (xii) perfluorohexanoic acid (PFHxA) (CASRN 307-24-4 ); (xii) perfluorodecanoic acid (PFDA) (CASRN 335-76-2); (xiii) 11-chloroeicosafluoro-3-oxaundecane-1-sulfonic acid (11Cl-PF3OUdS) (CASRN 763051-92-9); (xiv) 1H, 1H, 2H, 2H-perfluorodecane sulfonic acid (8:2 FTS) (CASRN 39108-34-4); (xv) 1H, 1H, 2H, 2H-perfluorohexane sulfonic acid (4:2 FTS) (CASRN 757124-72-4); (xvi) 1H, 1H, 2H,

2H-perfluorooctane sulfonic acid (6:2 FTS) (CASRN 27619-97-2); (xvii) 4,8-dioxa-3H-perfluorononanoic acid (ADONA) (CASRN: 919005-14-4); (xviii) 9-chlorohexadecafluoro-3-oxanone-1-sulfonic acid (9ClPF3ONS) (CASRN: 756426-58-1); (xviv) nonafluoro-3,6-dioxaheptanoic acid (NFDHA) (CASRN 151772-58-6); (xx) perfluoro (2-ethoxyethane) sulfonic acid (PFEESA) (CASRN 113507-82-7); (xxi) perfluoro-3-methoxypropanoic acid (PFMPA) (CASRN 377-73-1); (xxii) perfluoro-4-methoxybutanoic acid (PFMBA) (CASRN 863090-89-5); (xxiii) perfluorododecanoic acid (PFDoA) (CASRN 307-55-1); (xxiv) perfluoroheptanesulfonic acid (PFHpS) (CASRN 375-92-8); (xxv) perfluoroheptanoic acid (PFHpA) (CASRN 375-85-9); (xxvi) perfluoropentanesulfonic acid (PFPeS) (CASRN 2706-91-4); (xxvii) perfluoropentanoic acid (PFPeA) (CASRN 2706-90-3); (xxviii) perfluoroundecanoic acid (PFUnA) (CASRN 2058-94-8); (xxiv) n-ethyl perfluorooctanesulfonamidoacetic acid (NEtFOSAA) (CASRN 2991-50-6); (xxv) PFAS n-methyl perfluorooctanesulfonamidoacetic acid (NMeFOSAA) (CASRN 2355-31-9); (xxvi) perfluorotetradecanoic acid (PFTA) (CASRN 376-06-7); (xxvii) perfluorotridecanoic acid (PFTrDA) (CASRN 72629-94-8).; and (xxviii) any per- or poly-fluoroalkyl substance that contains at least one fully fluorinated methyl or methylene carbon atom (without any hydrogen, chlorine, bromine, or iodine atom attached to it).

35.    Properties.  In 1938, a chemist working for Old DuPont discovered PFAS.  By 1948, 3M acquired a patent for the fluorination of organic compounds and began mass-producing PFAS for use in its products.  PFAS, including AFFF products, have been and continue to be manufactured by Defendants at various sites in the United States.

36.    PFAS are fluorosurfactants (also known as fluorinated surfactants).  When dissolved in a liquid, surfactants like PFAS reduce the surface tension of the liquid, which allows the liquid to spread more easily among or across other substances.  Fluorosurfactants have a

fluorinated "tail" and a hydrophilic "head" which gives them their surfactant properties. These surfactants are used in a variety of applications including intermediate industrial processes and AFFF. Their use as intermediates in industrial processes can result in contamination of products manufactured through these processes.

37.     PFAS are also fluoropolymers (i.e., plastic containing fluorine). The unique physical and chemical properties of PFAS include oil and water repellency, temperature resistance, and friction reduction. These qualities make PFAS ideal for coatings in textiles and cookware, household products (e.g., stain- and water-repellants), food packaging (e.g., fast-food wrappers and paper products for packaging), and AFFF. Defendants have produced and continue to produce PFAS for applications in the aerospace, semiconductor, automotive, electronics, personal and beauty products, aviation, and construction sectors.

38.     The carbon-fluorine bonds in PFAS are strong, causing PFAS to be resistant to degradation in the environment (including biodegradation, photolysis, and hydrolysis). PFAS do not readily degrade in conventional systems for drinking water. Thus, PFAS persist for long periods of time in the environment and in the human body.

39.     PFAS Products. PFAS that were designed, manufactured, formulated, marketed, promoted, distributed, and/or sold by Defendants or their predecessor entities, have been used and/or are present in a wide array of PFAS Products, including, but not limited to the following: food packaging and preparation (e.g., sandwich wrappers and other papers and paperboard for packaging); commercial household products, including 3M Company's Scotchgard, stan- and water-repellant fabrics and carpets, nonstick products such as DuPont's Teflon, polishes, waxes, paints, and cleaning products; surfactants; personal care products; beauty products; manufacturing and production, including electronics manufacturing, textile manufacturing, and oil recovery;

plating processes, such as wetting agents/fume suppressants; insecticides; BASF's Ultramid and Ultradur products used for injection moldings; fluoropolymer production such as fluoropolymers for coatings, adhesives, plastics, fluoropolymer production in textile coating applications; and Tyco's AFFF and fire suppressant products, among many others.

**B.    PFAS are Harmful to Human Health**

40.    PFAS enter the human body through ingestion, inhalation, and dermal contact.

41.    PFAS contribute to the development of multiple diseases and health conditions, including: (a) cancers (livers, kidney, testicular, breast, pancreas, and prostate); (b) liver disease; (c) adverse pregnancy outcomes; (d) developmental effects (including delayed pubery); (e) reduced immune system responses including responses to vaccinations; (f) infertility; (g) reduced bone density in children; (h) diabetes; and (i) fatty liver disease, among others.

42.    Studies have identified several adverse health effects due to PFAS exposure.  The most comprehensive study is of the population living near the DuPont Washington Worksfacility in West Virginia.  This study identified links between PFAS exposure and the following diseases: high cholesterol, thyroid disease, pregnancy-induced hypertension, ulcerative colitis, and kidney and testicular cancer.  Over the last three decades, exposure to PFAS has been linked to significant adverse health impacts, such as kidney, liver, and testicular cancers, liver diseases, infertility, and diabetes.

43.    Studies from 2018, 2019, and 2020 have identified PFAS in breast milk and infant blood, indicating children are exposed to PFAS from birth.  A 2020 publication identified links between children's exposure to PFAS and high cholesterol, poor renal function, and immunotoxicity.  Immunotoxicity impacts antibody production and can result in vaccination failure.  This puts children at significant risk, given that most vaccines against deadly communicable diseases are administered in childhood.

44.     In addition to each PFAS' individual impacts, there is emerging science concerning the deleterious effect of exposure to a mixture of per- and polyfluoroalkyl substances. This is of particular concern because, as discussed below, the Band's members have been exposed to a mix of per- and polyfluoroalkyl substances through deer, fish., lake water., and. drinking water, and likely other sources.  The PFAS-Tox Database contains links to these studies and their health impacts: https://pfastoxdatabase.org/.

**C.      Defendants' Knowledge**

45.     As early as the 1940s, and continuing to the present, Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold PFAS Products.

46.     3M was the primary manufacturer of PFAS chemicals in the United States from the 1940s until 2002.  3M marketed and sold PFAS to be used in PFAS products throughout the United States.  For example, 3M manufactured Scotchgard, a PFAS Product, and PFOS and PFOA for use in AFFF.

47.     DuPont began manufacturing its own PFAS chemicals beginning in 1951, despite knowing about the health and environmental risks of PFAS in consumer products.  Like 3M, DuPont marketed and sold PFAS to be used in its PFAS Products, including Teflon, throughout the United States.

48.     3M was the first to conduct medical studies on the physiological and toxicological effects of PFAS.  Prior to 1980, 3M conducted toxicity studies through exposing rats and monkeys to PFAS.  Results showed that PFAS in rats were carcinogenic and caused chronic health issues. In a 90-day experiment, all monkeys died after twenty days, and the study had to be abandoned. In later monkey studies with lower exposure doses, results showed reductions in cholesterol, increased liver weight, and immune system toxicity.  In 1980, 3M measured PFAS concentrations in 3M workers and found levels ten times higher than the general population.  A 1992 doctoral

thesis, funded by 3M and submitted to the EPA in 2000, reported exposure to PFAS significantly altered male reproductive hormones and white blood cell counts.

49.    DuPont conducted similar toxicity studies on animal subjects in the 1960s through the 1990s. For example, in 1979 DuPont directed Haskell Laboratory to conduct a series of animal studies on PFOA. In rats, inhalation caused liver growth and ulcerations. In dogs, ingestion caused death.

50.    3M and DuPont knew for decades that PFAS chemicals were toxic and posed substantial health and environmental risks, but they continued to promote these chemical products for use in PFAS Products. Despite its extensive knowledge of the dangers of PFAS, DuPont was a founding member of the Fire Fighting Foam Coalition, which was formed to advocate for AFFF's continued viability despite the public beginning to become aware of its dangers. Each Defendant had access to information related to the dangers of PFAS compounds used in their products, but they kept this information hidden from the public as they continued to profit from the sale of PFAS and PFAS Products.

51.    Despite this knowledge, Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold PFAS Products for over fifty years. As a result, consumers, firefighters, military personnel, and others unknowingly released PFAS into the environment by using and/or purchasing PFAS Products, even when used as directed and intended by Defendants. 3M released PFAS chemicals into the environment in Minnesota. Defendants' actions directly resulted in the contamination of the Band's Reservation and off-reservation resources.

52.    The U.S. military, civilian airports, and fire departments throughout the country have used and/or continue to use AFFF and products containing AFFF to extinguish flammable

liquid fires. In February 2024, the United States banned PFAS-containing food wrappers. However, Defendants continue to design, manufacture, formulate, market, promote, distribute, and sell other PFAS and PFAS Products.

**D.    PFAS Regulatory Framework**

**1.    Minnesota Framework**

53.    The Minnesota Department of Health ("MDH") regulates drinking water quality in the State of Minnesota pursuant to the Safe Drinking Water Act of 1977, Minn. Stat. §§ 144.381–.387. All drinking water suppliers must strictly comply with the regulatory requirements described in Chapter 4720 of the Minnesota Rules, part 4720.0010–.9080.

54.    MDH imposes rules and guidance to ensure water is safe to drink. A health-based guidance value ("HBV") is the level of a contaminant that can be present in water and pose little or no health risk to a person drinking that water over a lifetime. As demonstrated below, the Band's drinking water for the Bug-O-Nay-Ge-Shig School contains PFOS and PFOA levels exceeding Minnesota's HBVs.

55.    MDH established HBVs for per- and polyfluoroalkyl substances in 2002 but revised these HBVs in 2023 due to advances in scientific understanding of PFAS. Minnesota's HBVs below are measured in parts per billion ("ppb"). Other studies and labs measure levels of PFAS in parts per trillion ("ppt") or parts per million ("ppm"). Ppm, ppb, and ppt indicate a concentration measurement. Ppt is 1000 times smaller than ppb, and ppm is 1000 times smaller than ppb.

**Minnesota Health-Based Values for PFAS**

| PFAS | Drinking Water Guidance Value (ppb) |
|---|---|
| Perfluorobutane sulfonate (PFBS) | 0.1 [100 ppt] |

| | |
|---|---|
| Perfluorobutanoic acid (PFBA) | 7 [7,000 ppt] |
| Perfluorohexane sulfonate (PFHxS) | 0.047 [47 ppt] |
| Perfluorohexanoic acid (PFHxA) | 0.2 [200 ppt] |
| Perfluorooctanoic acid (PFOA) | 0.0000079 [0.0079 ppt] |
| Pefluorooctane sulfonate (PFOS) | 0.0023 [2.3 ppt] |

56.    MERLA.  The Minnesota Environmental Response and Liability Act ("MERLA") was established in 1983 as a state Superfund law which provides the Minnesota Pollution Control Agency ("MPCA") and the Minnesota Department of Agriculture with the authority to investigate and clean up sites contaminated by hazardous substances and agricultural chemicals.  MERLA also provides a private right of action to hold polluting parties responsible for releasing hazardous substances, including hazardous wastes, into the environment.  "Under MERLA, PFAS meets the definition of a hazardous substance based on its properties."[4]  MPCA proposed in 2021 to classify PFAS as a hazardous substance under MERLA.  MPCA has also issued PFAS remediation guidance "consistent with [MERLA] and the Resource Conservation and Recovery Act (RCRA) framework."[5]

57.    In May 2023, Governor Tim Walz signed into law HF 2310, also known as Amara's Law, *see* Minn. Stat. § 116.943, banning the sale of certain products containing "intentionally added" per- and polyfluoroalkyl substances beginning in 2025, and all products containing per- and polyfluoroalkyl substances beginning in 2032.  This law also establishes reporting

---

[4] Minnesota's PFAS Blueprint, at 126 (Feb. 2021), https://www.pca.state.mn.us/sites/default/files/p-gen1-22.pdf.

[5] Minnesota Pollution Control Agency, *PFAS Remediation Guidance*, https://www.pca.state.mn.us/business-with-us/pfas-remediation-guidance#:~:text=Remediation%20PFAS%20Guidance%20serves%20entities,in%20the%20PFAS%20Monitoring%20Plan.

3325458.1

requirements beginning in 2026 for product manufacturers on products containing per- and polyfluoroalkyl substances. Bans on sale, offer of sale, and distribution in the state apply to "persons," including retailers.

### 2.    Federal Regulation

58.    In 2021, the EPA launched the PFAS Strategic Roadmap, which includes actions aimed at reducing the release of PFAS into the environment.[6] The EPA's roadmap focuses on (a) preventing PFAS contamination, (b) holding PFAS polluters accountable, and (c) promoting remediation. In practical terms, these efforts include nationwide monitoring and regulation of PFAS in drinking water, required reporting for PFAS manufactured and used in the United States, and preventing companies from starting or resuming the manufacture or processing of certain PFAS.

59.    Health Advisory Levels. In 2016, the EPA issued interim health advisories for PFOA and PFOS of 70 ppt. The EPA publishes health advisories to provide federal, state, and local officials as well as public water system operators with estimates of acceptable drinking water levels for a chemical substance based on health effects information. In June 2022, the EPA released significantly revised interim health advisories for PFOA and PFOS based on epidemiological studies that identified negative health effects at a lower level of exposure. However, in 2024, the EPA recognized that the 2022 PFOA and PFOS interim health advisories, which were based on 2021 draft toxicity values, no longer reflect the best available scientific information.

---

[6] U.S. EPA, *PFAS Strategic Roadmap: EPA's Commitments to Action 2021-2024* (Oct. 18, 2021), https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf.

60.     Under the current regulatory regime, the EPA has issued lifetime health advisories for only four types of PFAS: PFOA, PFOS, GenX (HFPO-DA), and PFBS.  The chart below identifies the E.P.A.'s current health advisory levels.[7]

### EPA Lifetime Health Advisory Levels

| | |
|---|---|
| PFOA | 0.004 ppt |
| PFOS | 0.02 ppt |
| Gen-X | 10 ppt |
| PFBS | 2,000 ppt |

61.     <u>National Primary Drinking Water Regulation</u>.  In April 2024, the EPA established the first-ever National Primary Drinking Water Regulation ("NPDWR") for PFAS under the Safe Drinking Water Act ("SDWA").  The regulation targets PFOA, PFOS, PFNA, PFHxS, and HFPO-DA (GenX chemicals).

### National Primary Drinking Water Regulation Targets

| Chemical | Maximum Contaminant Level Goal (MCLG) | Maximum Contaminant Level (MCL) |
|---|---|---|
| PFOA | 0 | 4.0 ppt |
| PFOS | 0 | 4.0 ppt |
| PFNA | 10 ppt | 10 ppt |
| PFHxS | 10 ppt | 10 ppt |
| HFPO-DA (GenX chemicals) | 10 ppt | 10 ppt |
| **Mixture of two or more:** | | |
| PFNA, PFHxS, HFPO-DA, and PFBS | Hazard Index of 1 | Hazard Index of 1 |

---

[7] *See* U.S. E.P.A., *Questions and Answers: Drinking Water Health Advisories*, *available at* https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs#q4.

3325458.1

62.     These MCLs are intended to protect public health from potential long-term exposure to these harmful chemicals.

63.     Under this regulation, water systems will be required to regularly monitor for PFAS in drinking water and notify the public if these levels are exceeded.  Water systems that detect PFAS above the MCLs will have five years to reduce PFAS in their drinking water.

64.     <u>Fish and Water Guidelines</u>.  In December 2024, the EPA published draft recommendations for PFAS levels in water, fish and shellfish from inland and nearshore bodies of water.  The EPA identified two categories of surface water: (1) water + organism; and (2) organism only.  The EPA has proposed Human Health Criteria ("HHC") levels for three types of PFAS: PFOA, PFOS, and PFBS.  The EPA recommends that the level of PFOA, PFOS, and PFBS in bodies of water not exceed the draft HHCs and have based these draft recommended levels on human health toxicity assessments.[8]  These HHC levels provide guidance for establishing state and tribal water quality standards, for limiting PFAS in wastewater discharges, for establishing restoration targets for water bodies contaminated with PFAS, and for consumption of fish and shellfish from contaminated water.

**Human Health Criteria: Water + Organism**

| | |
|---|---|
| PFOA | 0.0009 ppt |
| PFOS | 0.06 ppt |
| PFBS | 400 ppt |

**Human Health Criteria: Organism Only**

---

[8] *See* U.S. EPA, *Technical Fact Sheet: Draft National Recommended Human Health Ambient Water Quality Criteria for PFOA, PFOS, and PFBS* (Dec. 2024), https://www.epa.gov/system/files/documents/2024-12/draft-hhc-pfas-tech-fact-sheet.pdf.

- 24 -

PFOA                          0.0036 ppt

PFOS                          0.07 ppt

PFBS                          500 ppt

65.     In September 2024, the EPA published its final recommended aquatic life criteria

and benchmarks focused on protecting aquatic life.  Developed under section 304(a)(2) of the

Clean Water Act, the final recommended aquatic life criteria and benchmarks represent the highest

concentrations of pollutants in surface water that would allow fish and other aquatic organisms to

live, grow, and reproduce.  These criteria and benchmarks provide guidance for establishing state

and tribal water quality standards, for limiting PFAS in wastewater discharges, for establishing

restoration targets for water bodies contaminated with PFAS, and for consumption of fish and

shellfish from contaminated water.

**Figure 1. Final Recommended Freshwater Aquatic Life Water Quality Criteria for PFOA and PFOS**[9]

| Criteria Component | Acute Water Column (CMC)[1] (mg/L) | Chronic Water Column (CCC)[2] (mg/L) | Invertebrate Whole-Body (mg/kgw) | Fish Whole-Body (mg/kgww1) | Fish Muscle (mg/kgww1) |
|---|---|---|---|---|---|
| **PFOA Magnitude** | 3.1 | 0.10 | 1.18 | 6.49 | 0.133 |
| **PFOS Magnitude** | 0.0 71 | 0.00025 | 0 .028 | 0.201 | 0.087 |
| **Duration** | 1-hour average | 4-day average | Instantaneous | Instantaneous | Instantaneous |
| **Frequency** | Not to be exceeded more than once in three years, on average | Not to be exceeded more than once in three years, on average | Not to be exceeded | Not to be exceeded | Not to be exceeded |

[1]Criterion Maximum Concentration. [2]Criterion Continuous Concentration.  [3]Wet Weight.

---

[9] *See* U.S. EPA, *Final Recommended Aquatic Life Criteria and Benchmarks for Select PFAS* (Sept. 2024), https://www.epa.gov/system/files/documents/2024-09/pfoa-pfos-pfas-final-factsheet-2024.pdf.

3325458.1

Figure 2. Acute Saltwater Aquatic Life Benchmarks for PFOA and PFOS[10]

| Chemical | PFOA (mg/L) | PFOS (mg/L) |
|---|---|---|
| Magnitude | 7.0 | 0.55 |
| Duration | 1-hour average | |
| Frequency | Not to be exceeded more than once in three years on average | |

Figure 3. Acute Freshwater Aquatic Life Benchmarks for Eight PFAS[11]

| Chemical | PFBA (mg/L) | PFHxA (mg/L) | PFNA (mg/L) | PFDA (mg/L) | PFBS (mg/L) | PFHxS (mg/L) | 8:2 FTUCA (mg/L) | 7:3 FTCA (mg/L) |
|---|---|---|---|---|---|---|---|---|
| Magnitude | 5.3 | 4.8 | 0.65 | 0.50 | 5.0 | 0.21 | 0.037 | 0.012 |
| Duration | 1-hour average | | | | | | | |
| Frequency | Not to be exceeded more than once in three years on average | | | | | | | |

66.   CERCLA Regulations.   In May 2024, the EPA designated PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), also known as the Superfund law.

67.   This listing enables the EPA to clean up contaminated sites and compel responsible parties to take action to address PFAS contamination.  It also provides a mechanism for tribal, federal, and state governments to hold polluters accountable for cleanup costs.

68.   Under CERCLA, companies or parties responsible for PFAS contamination may be required to pay for the remediation of polluted sites, such as landfills or industrial sites where PFAS have been released into the environment.

69.   RCRA.   In February 2024, the EPA proposed adding nine PFAS to the Resource Conservation and Recovery Act's list of hazardous constituents in Title 40 of the Code of Federal Regulations Part 261.  The nine PFAS proposed for addition to the hazardous constituents list are:

---

[10] *Id*.

[11] *Id*.

(1) PFOA; (2) PFOS; (3) PFBS; (4) HFPO-DA; (5) PFNA; (6) PFHxS; (7) PFDA; (8) PFHxA; and (9) PFBA.

70.    To be listed as a hazardous constituent, studies must show that a chemical has toxic, carcinogenic, mutagenic, or teratogenic effects on humans or other living organisms. After evaluating toxicity and epidemiology data for these nine chemicals, EPA determined that these nine PFAS compounds meet the criteria for listing as a RCRA hazardous constituent.

71.    <u>Wastewater and Industrial Release</u>. The EPA has also taken steps to regulate PFAS discharges from wastewater systems and the presence of PFAS in industrial releases.

72.    The EPA's Effluent Guidelines Program is working to study and develop national guidelines for PFAS in industrial discharges, particularly for industries such as landfills, textile manufacturing, and electroplating.

73.    In January 2025, the EPA released a Draft Sewage Sludge Risk Assessment for PFOA and PFOS. The EPA found there may be human health risks associated with using sewage sludge as a soil amendment—such as for farms, pastures, golf courses, lawns, and home gardens—if the sludge contains 1 ppb or more of PFOA or PFOS.

### 3.    **Tribal Regulation**

74.    Pursuant to Section 518 of the Clean Water Act of 1972, on November 2, 2011, the EPA has grant the Band treatment in a similar manner as a State status ("TAS"), which allows the Band to issue water quality standards that are administered through the permitting and regulatory provisions of the Clean Water Act. Pursuant to its TAS, on October 24, 2024, the Band enacted the Leech Lake Band of Ojibwe Water Quality Standards Act for surface waters on the Reservation. EPA approved these standards on December 20, 2024. The standards classify Reservation waters according to designated uses of those waters, prescribe water protection criteria to attain and sustain those uses, and establish water quality standards and an anti-degradation

policy that meet the provisions of 40 C.F.R. Part 131 to protect Reservation waters. These standards were enacted for "the preservation of all things within the aquatic community which support the health and welfare, cultural, spiritual, and religious uses, environmental quality, safety, economic security, and ultimately the Sovereignty of the Band." LLBO Water Quality Standards Act, Ordinance 2025-1, at 2. The Band established the following water quality standards through the Act:

**Leech Lake Band of Ojibwe Water Quality Standards**

| Pollutant | Standards (MCL) |
|-----------|-----------------|
| PFOA | 4 ppt |
| PFOS | 4 ppt |
| PFHxS | 10 ppt |
| PFNA | 10 ppt |

**E.      PFAS Contaminate the Environment**

75.     PFAS enter the environment from several vectors, remain in the environment due to their resistance to degradation, and migrate throughout water systems and the environment over time. Contamination source points include industrial sources, AFFF use sites, landfills, and wastewater facilities.

76.     Industrial sources of contamination include manufacturing facilities where PFAS Products are made and chemical feedstocks are used. Facilities that produce PFAS as processing agents for fluoropolymer production are also contamination source points. Secondary manufacturing facilities use products and chemical feedstocks as part of the industrial processes when coating, sealing, and finishing products. Other industrial sources of contamination include textile and leather processors, paper mills, metal finishers, wire manufacturers, plating facilities, and aviation manufacturers. Manufacturers producing and using surfactants, resins, molds,

plastics, and semiconductors are also known contamination sources. These industrial facilities release PFAS into the environment via wastewater discharge, onsite and offsite disposal of waste, accidental releases such as spills, and stack emissions.

77.    The use and disposal of PFAS Products can result in PFAS migrating into the environment. Landfills are contamination source sites because they are the final repositories for PFAS-contaminated industrial waste, sewage sludge, waste from site mitigation, and consumer goods. PFAS from the waste disposed of in operating landfills and former landfills can leach into groundwater, surface water, and soils.

78.    Municipal, industrial, and manufacturing wastewater treatment plants ("WWTPs") introduce PFAS into the environment through discharges of treated effluent, leakage, air emissions, and disposal of biofluids. Most wastewater received by WWTPs is contaminated by PFAS via consumer products and industrial sources, and conventional treatment processes are ineffective in removing PFAS. As a result, PFAS are present in solid waste that ultimately contaminates groundwater, surface water, and soils. Certain PFAS can be released into the atmosphere from WWTP operations, such as aeration chambers.

79.    The use of AFFF is also a major source of PFAS contamination. Firefighters apply AFFF by spraying the foam onto fire, such that PFAS can spread easily into surrounding soil, groundwater, and surface water. AFFF was routinely used in training exercises at military installations, airports, fire departments, refineries, and other industrial facilities. PFAS have been detected at and in proximity to these locations where AFFF was historically used and where it is currently being used.

80.    PFAS can shed from product use directly and contaminate the surrounding environment. For example, PFAS shedding from PFAS Products deposited or used outdoors,

include, but are not limited to, contaminated biosolids used as fertilizer, agricultural PFAS Products (including, but not limited to, pesticides), paints, treatments, coatings and other consumer, commercial, and industrial uses.

81.    Agricultural crops may become contaminated with PFAS through use of sewage sludge as fertilizer, irrigation water, soil diffusion, soil amendments, and atmospheric deposition. Crop exposure to PFAS may disturb critical biological functions, such as seed germination, plant development, and photosynthesis. PFAS contamination in soil may therefore affect crop growth and reduce yield amounts. Further, the uptake and storage of PFAS chemicals in soil has been found in crops such as potatoes, oats, ryegrass, spring wheat, maize, and rice. Because diet is a key pathway for human exposure to PFAS, the consumption of PFAS-contaminated agricultural products, either directly (as a part of the diet) or indirectly (through contaminated livestock), may increase PFAS-contamination levels in humans.

82.    PFAS are found in wildlife, livestock, and aquatic animals around the world. The Environmental Working Group analyzed over 200 peer-reviewed studies documenting wildlife contamination and identified over 330 species contaminated by PFAS. This analysis revealed that PFAS contamination has spread to every country and continent, including the United States. Testing of livestock, pets, and wildlife almost always reveals PFAS contamination.

83.    PFAS are known to bioaccumulate in wildlife, livestock, and aquatic life, and therefore may have adverse health effects on those species, including impacts on reproduction and development, and impacts to the immune, nervous, and endocrine systems. PFAS exposure may contribute to decreased reproductive success, impact survival, and limit overall population levels across species. PFAS exposure may therefore adversely affect wildlife and livestock relied on as food sources, as well as endangered and other species with intrinsic cultural values.

84.    PFAS contamination poses a substantial threat to natural resources and the environment. PFAS's mobility and persistence ensure that PFAS will continue to contaminate drinking water, surface water, groundwater, soil, and air on the Leech Lake Reservation, exposing people and wildlife to dangerous health effects, unless and until the PFAS contamination is treated, removed, mitigated, or otherwise cleaned up from the environment. Even then, long-term health monitoring and treatment of the Band's Tribal members will likely be required as a result of this PFAS exposure.

### 1.    PFAS Contamination of Minnesota Resources

85.    Since the early 2000s, the state of Minnesota, through its state agencies, has undertaken significant testing and remediation efforts to identify and address PFAS contamination, including but not limited to the testing of groundwater, residential wells, wastewater, landfills, and composting facilities. Sampling over the past two decades revealed PFAS contamination across the state.

86.    Residential Wells. MPCA began sampling private wells in 2003. Over the course of twenty years, the Agency sampled 4,409 wells.[12] If an individual PFAS analyte is detected at a concentration above the MDH health-based guidance *or* when multiple PFAS analytes in a sample exceed the MDH's Health Risk Index of 1, the Pollution Control Agency issues a drinking water advisory to the homeowner. Since 2003, MPCA has issued over 1,500 advisories to homeowners.[13] Thirty-four percent of all wells tested contained PFAS above the state's health-

---

[12] *See* Minnesota Pollution Control Agency, *2023 Residential Well Sampling for Per- and Polyfluoroalkyl Substances Compounds* (Mar. 19, 2024), https://www.lrl.mn.gov/docs/2024/mandated/240606.pdf.

[13] *Id*.

3325458.1

based guidance or Health Risk Index.  *Id.*  Upon information and belief, PFAS have contaminated private wells on the Reservation.

87.    <u>Landfills</u>.  MPCA tested for PFAS in groundwater at 102 of the 111 closed landfill sites in Minnesota.  Of the 102 test sites, the MPCA identified 100 PFAS-contaminated landfills. Sixty-two of these sites had PFAS levels exceeding state health advisory levels for water.[14]

88.    The MPCA identified PFAS in groundwater at a closed landfill, the Leech Lake Landfill, located in northeastern Hubbard County and within the Leech Lake Reservation, as demonstrated in the map included in this paragraph.  The specific compounds and levels are not specified, but the MPCA has confirmed that PFAS levels exceed 1.07 times the health standards.



---

[14] *See PFAS and Closed Landfills*, https://www.pca.state.mn.us/air-water-land-climate/pfas-and-closed-landfills.

89.    Composting Facilities.  In 2019, MPCA commissioned a study of organic material and yard waste sites in Minnesota.[15]  Analyzing eighty-eight surface water samples at seven composting facilities, the study revealed PFAS at all collection sites—including PFAS analytes found in AFFF.

90.    AFFF Sites.  Airports throughout Minnesota used AFFF for firefighter training and fire suppression.  In the mid-2010s, MDH and MPCA began sampling water supply systems at known AFFF sites.  The City of Bemidji, located upstream from the Band's Reservation, was identified as one location at risk of contamination.  State testing revealed the presence of PFHxS, PFOS, and PFBA in private drinking wells near the Bemidji Regional Airport.  In 2013, sampling performed under the EPA's third Unregulated Contaminant Monitoring Rule identified PFAS in Bemidji's drinking water.  The City of Bemidji ceased use of two wells and blended water from the remaining three wells to ensure PFAS remained at levels that were believed to be safe for human consumption.

91.    Wastewater Plants.  Minnesota published PFOS sampling results for thirty-one wastewater treatment plants across the state.  Results identified PFAS contamination in thirteen of the thirty-one wastewater treatment plants.[16]

92.    The City of Bemidji operates a waste water treatment facility (the "Bemidji WWTF") which is located approximately 16 river miles upstream of the Leech Lake Reservation.  The Bemidji WWTF was constructed in 1985 to address nutrient pollution in Lake Bemidji and Wolf Lake.  Water from the City of Bemidji is treated and discharged into the Mississippi River

---

[15] Minnesota Pollution Control Agency, *Evaluation of PFAS at Select SSOM and Yard Waste Sites* (Sept. 2019), https://www.pca.state.mn.us/sites/default/files/w-sw4-37.pdf.

[16] *See Results From Testing for PFCs at Wastewater Treatment Plants in Minnesota*, https://www.pca.state.mn.us/sites/default/files/pfc-wwtpsampling.pdf.

3325458.1

immediately upstream of Lake Bemidji; the Mississippi River exits Lake Bemidji and flows downstream before entering Wolf Lake and the Leech Lake Reservation. There is no monitoring or regulation of PFAS compounds in the Bemidji WWTF NPDES permit (MN0022462). Further, the Bemidji WWTF does not apply any treatment to remove PFAS compounds. PFAS-contaminated wastewater from the Bemidji WWTF, including wastewater originating from the City of Bemidji's three operating municipal wells, flows downstream and enters the Leech Lake Reservation.

### 2. PFAS Contamination of the Band's Resources

93.     In addition to Minnesota state testing efforts, the Band conducted testing of drinking water sources, lakes, fish, and deer on the Leech Lake Reservation. Sampling revealed toxic levels of PFAS in drinking water, popular lakes used for recreation and fishing purposes, and in fish and wildlife that Tribal members consume. The Band has incurred and will continue to incur substantial costs from PFAS contamination. These include, or will include, costs related to additional testing and treatment of its public drinking water systems, testing of citizen's private drinking water wells, testing of natural resources such as fish, wildlife, crops, soil, lakes, and rivers, remediation and mitigation of contaminated natural resources, health monitoring and increased healthcare costs for its members, and providing governmental services and programs in order to test, treat, remediate, and mitigate PFAS contamination.

94.     Drinking Water Contamination. In 2022, the Band participated in two separate voluntary testing programs: (1) an EPA testing program which tested the Band's eleven public drinking water systems; and (2) a program through the BIE which tested only the Bug-O-Nay-Ge-Shig School's public drinking water system. Of the Band's eleven water systems, one tested positive for PFAS concentrations exceeding the EPA's health advisory levels. The contaminated water system provides drinking water for the Band's Bug-O-Nay-Ge-Shig School. As identified

in the chart below, sampling revealed two types of PFAS in the school's drinking water: PFOA and PFOS. Both PFOA and PFOS are known to be found in AFFF Products. The levels found in the school's water far exceeded the EPA's 2022 interim health advisory levels, as well as the MCL for PFOA. Thus, the Band ceased operation of the school's drinking water system and continues to supply bottled water to the school. The Band will also incur the costs associated with drilling a new well to supply drinking water to the Bug-O-Nay-Ge-Shig School.

95.    After further investigation, the BIE and the Band identified Hillyard Seal 341® Seal Finish, sold by Hillyard, as one source of this PFAS contamination. This product is commonly used as floor wax, and the Band had used the Hillyard product over several years for waxing the school's flooring. Though this product contains PFAS, it is marketed as a "green" product. Hillyard does not manufacture the PFAS contained in this product; Defendants manufacture the PFAS contained in Hillyard's floor wax product.

### Bug-O-Nay-Ge-Shig School Test Results

| PFAS Detected | Result | EPA Health Advisory Level |
|---|---|---|
| PFOA | 5.9 ppt | 0.004 ppt |
| PFOS | 2.3 ppt | 0.02 ppt |

96.    In October 2023, the Band's Environmental Department engaged Eurofins Sacramento to test water from Cass Lake and Pike Bay. As identified below, sampling revealed PFOA, PFBA, PHBA, PFHxA, and PFHpA in Cass Lake and Pike Bay. The levels of PFOA in both lakes far exceed the EPA's proposed Water + Organism HHC level of 0.0009 ppt and Organism Only HHC level of 0.0036 ppt.

### Cass Lake Test Results

| PFAS Detected | Result |
|---|---|
| PFOA | 0.54 ppt |
| PFBA | 4.6 ppt |
| PFHxA | 0.56 ppt |
| PFHpA | 0.63 ppt |

### Pike Bay Test Results

| PFAS Detected | Result |
|---|---|
| PFOA | 0.49 ppt |
| PHBA | 3.3 ppt |
| PFHpA | 0.71 ppt |

97.    The Band's Reservation includes hundreds of lakes and rivers. To protect the health and welfare of its Tribal members, the Band will have to test those resources to confirm the existence and scope of any such PFAS contamination, and the impact that such contamination may have on its people and resources. The cost of testing and remediating all contaminated water bodies on the Reservation imposes an enormous financial burden on the Band.

98.    Given the presence of PFAS in surrounding groundwater and surface water, private wells owned by the Band's members are exposed to PFAS contamination.

99.    PFAS contamination has also been detected in fish on the Reservation. In October 2023, the Band engaged Eurofins Sacramento to test six species of fish from Cass Lake and Pike Bay. Through discrete and composite testing, the results revealed levels of PFAs analytes in all

- 36 -

species above minimum detection levels ("MDL"). The chart below identifies the January 2024 results for each sample tested. In the species identified below, the levels of PFOS and PFOA exceed the EPA's proposed Organism Only HHC level of 0.0036 ppt: Cass Lake Whitefish; Cass Lake Tulibee; Cass Lake White Sucker; Pike Bay Northern Pike; Pike Bay White Sucker; Pike Bay Walleye; and Pike Bay Yellow Perch.

| Species | Lake | Analyte | Result | MDL |
|---------|------|---------|--------|-----|
| Lake Whitefish | Cass | PFNA | 260 ppt | 240 ppt |
| | | PFOS | 280 ppt | 210 ppt |
| Yellow Perch | Cass | | No Detect | |
| Tulibee (Cisco) | Cass | PFOA | 250 ppt | 120 ppt |
| | | PFNA | 580 ppt | 250 ppt |
| | | PFOS | 650 ppt | 220 ppt |
| Northern Pike | Pike Bay | PFOS | 300 ppt | 210 ppt |
| White Sucker | Pike Bay | PFNA | 370 ppt | 240 ppt |
| White Sucker | Pike Bay | PFOA | 120 ppt | 110 ppt |
| | | PFOS | 450 ppt | 200 ppt |
| Walleye | Cass | PFUnA | 280 ppt | 260 ppt |
| | | PFOS | 510 ppt | 210 ppt |
| White Sucker | Cass | PFOA | 130 ppt | 120 ppt |
| | | PFNA | 340 ppt | 240 ppt |
| | | PFOS | 380 ppt | 210 ppt |
| Walleye | Pike Bay | PFUnA | 340 ppt | 250 ppt |
| | | PFOS | 490 ppt | 200 ppt |
| Yellow Perch | Pike Bay | PFOA | 230 ppt | 110 ppt |
| Lake Whitefish | Pike Bay | PFNA | 460 ppt | 220 ppt |
| Northern Pike | Pike Bay | PFNA | 230 ppt | 230 ppt |
| | | PFOS | 740 ppt | 200 ppt |

100.    In February 2025, the Band captured twenty-two deer for sampling purposes and analyzed the deer livers for PFAS. Deer are a crucial component of the Band's members' diets and cultural traditions. PFBA was identified in all samples, and PFOS was identified in two samples.

| Sample | Analyte | Result |
|--------|---------|--------|
| 822 | PFBA | 7400 ppt |
| 769 | PFBA | 4200 ppt |
| 305 | PFBA | 5200 ppt |
| 304 | PFBA | 1300 ppt |
| 823 | PFBA | 8300 ppt |
| 340 | PFBA | 2900 ppt |
| 331 | PFBA | 7600 ppt |
| 332A | PFBA | 5700 ppt |
| 332B | PFBA | 8300 ppt |
| 335 | PFBA | 7300 ppt |
| 350 | PFBA | 5700 ppt |
| 344 | PFBA | 8800 ppt |
| 841 | PFBA | 12000 ppt |
| 842 | PFBA | 11000 ppt |
| 843 | PFBA | 12000 ppt |
| 849 | PFBA | 9800 ppt |
| 850 | PFBA | 14000 ppt |
| 846 | PFBA | 8400 ppt |
| 365 | PFBA | 12000 ppt |
| 370 | PFBA | 22000 ppt |
|  | PFOS | 4400 ppt |
| 369 | PFBA | 23000 ppt |
|  | PFOS | 2800 ppt |
| 334 | PFBA | 3800 ppt |

101.    Wild rice, an integral part of the history and culture of the Band, is harvested for consumption and sale to Tribal members and non-members.  Upon information and belief, and given the presence of PFAS in surrounding groundwater and surface water, wild rice is exposed to PFAS contamination and is likely contaminated.

102.    In the summer of 2025, the Leech Lake Air Program, a program operated by the Band, partnered with the National Atmospheric Deposition Program ("NADP") and joined their National Trends Network ("NTN").  Through the NTN, the Band monitors for PFAS in the air by collecting weekly samples with NADP.  The study is federally-funded for five years of data

3325458.1

analysis, but the study will also require staffing using the Band's employees.  The results of this study will become available after the data analysis concludes in 2030.

103.    <u>Health Impacts on Tribal Members.</u>  The Band operates the Health Division, which is an arm of the Tribe that provides health services to the Band's members.  Upon information and belief, the Band has expended financial and staffing resources addressing health impacts on the Band's members due to PFAS contamination, including but not limited to treatment of the illnesses identified in paragraphs 40-44, *infra*.

104.    Due to known sites, namely, PFAS contamination on and near the Reservation, and confirmed toxic levels of PFAS in natural resources on the Reservation, the health and welfare of the Band's members are at risk and will continue to be at risk until the contamination of the Band's drinking water, ground and surface water, and natural resources are remediated.  Even after remediation, it is likely that the Band's members will suffer adverse health effects due to their historical exposure to PFAS.

105.    The Band brings the following causes of action to hold Defendants accountable for the harms caused by their PFAS-related actions and inactions.

### CAUSES OF ACTION

### COUNT I – PUBLIC NUISANCE (Minn. Stat. § 561.01)

106.    The Band hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs 1 through 105 as if fully restated herein.

107.    This cause of action is brought pursuant to Minnesota law.

108.    Defendants' wrongful and illegal actions, as alleged above, resulted and continue to result in the discharge of PFAS in the environment, contaminating the Leech Lake Reservation, the waters that adjoin the Band's fee and trust lands, the Band's drinking water, fish, and other natural resources.

109.    The discharge of PFAS in the environment unreasonably annoys, injures, or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public, including the Band's members.  Defendants caused a condition that unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of any considerable number of members of an entire community, namely the Band.

110.    The contamination of the Band's lakes and fish prevented and continues to prevent the Band from safely consuming fish, threatens the Band's food security, tourism, treaty rights, and cultural practices, and constitutes a substantial interference with the Band's use of its property, including the waters that adjoin the Band's fee and trust lands.

111.    The contamination of the Band's drinking water at the Bug-O-Nay-Ge-Shig School prevents the Band from safely consuming drinking water and impairs the health of the Band's most vulnerable members.

112.    The contamination of waters adjoining the Band's fee and trust lands prevent the Band and its members from safely making reasonable uses of those waters.  That not only deprives the Band and its members of riparian rights to these waters but also reduces the value of the Band's adjoining or underlying lands.

113.    The inability to have safe-to-consume fish and drinking water has caused the Band significant harm both financially and culturally, and interferes with the Band's and its members' use and enjoyment of life and property, which includes the exercise of their legally-protected treaty rights and riparian rights.

114.    Defendants intentionally, unlawfully, and recklessly designed, manufactured, formulated, marketed, promoted, distributed, and sold (directly or indirectly) PFAS and PFAS Products that Defendants know, or reasonably should know, cause the spread of harmful PFAS

contamination to the Band, the Reservation, the waters that adjoin the Band's fee and trust lands, and the Band's members.

115.    Defendants' actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

116.    Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect.

117.    Defendants know, or reasonably should know, that their conduct would be injurious to the health and safety of the members of the Band, is indecent and offensive to the senses, and interferes with the comfortable enjoyment of life and property, which includes the exercise of the Band's legally-protected treaty rights and riparian rights.

118.    By reason of the foregoing, Defendants are liable to the Band for the damages it has suffered because of Defendants' actions, the amount of which will be determined at trial.

119.    Accordingly, the Band seeks damages from Defendants directly resulting from its injuries in a sufficient amount to compensate for injuries and loss and to restore the Band to its original position, including but not limited to, the difference in the value of the Reservation lands and waters and such value if the harm had not been done, the value of the riparian rights, the cost of repair or restoration, and direct, and consequential damages resulting from the nuisance which are the natural and proximate result of Defendants' conduct, as well as costs and damages for studies, testing, treatment, mitigation, remediation, and abatement of the PFAS chemicals, medical monitoring and costs to the Band associated with health impacts to Tribal members, and any other relief allowed under law or equity.

## COUNT II – NEGLIGENCE

120.    The Band hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs 1 through 105 as if fully restated herein.

Filed in District Court
State of Minnesota
9/25/2025 3:31 PM

121.    This cause of action is brought pursuant to Minnesota law.

122.    As designers, manufacturers, formulators, marketers, distributors, promoters, and/or sellers of goods containing PFAS, the production and dissemination of which result in PFAS contamination, Defendants owed a duty to the Band as well as to all persons whom Defendants' products might foreseeably harm to exercise reasonable care in the design, manufacture, formulation, marketing, distribution, promotion and sale.

123.    Upon learning of the release of toxic substances, including but not limited to PFAS, Defendants owed the Band a duty to act reasonably to remediate, contain, and eliminate the release before it reached and contaminated Cass Lake, Pike Bay, the Band's Reservation and off-reservation fee and trust lands, fish and wildlife, other natural resources, and the Bug-O-Nay-Ge-Shig School's public water system, as well as to warn buyers, consumers, and residents of the toxicity of PFAS.

124.    Defendants had a duty not to contaminate the Band's natural resources by permitting the release of PFAS into the soil, groundwater, lakes, rivers, and other natural resources of the Band's Reservation and off-reservation fee and trust lands.

125.    Defendants failed to take reasonable, adequate, and sufficient steps or action to eliminate, correct, remedy, or warn of a release of PFAS after it occurred.

126.    The contamination of the Bug-O-Nay-Ge-Shig School's public drinking water system and its impact on the Band's Reservation lands was a foreseeable harm from Defendants' actions.

127.    The contamination of the water and aquatic life in Cass Lake and Pike Bay and its impact on the Band's reservation lands was a foreseeable harm from Defendants' actions.

128.    Defendants' breach of their duties was the direct, sole, and/or proximate cause of the Band's damages as alleged herein and of the imminent, substantial, and impending harm to the Band.

129.    The Band seeks compensatory damages in a sum determined by a jury, as well as costs and damages for studies, testing, treatment, mitigation, remediation, and abatement of the PFAS chemicals, medical monitoring and costs to the Band associated with health impacts to Tribal members, and any other relief allowed under law or equity.

## COUNT III – PRODUCT LIABILITY

130.    The Band hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs 1 through 105 as if fully restated herein.

131.    This cause of action is brought pursuant to the laws of Minnesota.

132.    Defendants' design, manufacturing, formulation, use, operational, and disposal practices of PFAS and PFAS Products led to products that were in a defective condition unreasonably dangerous to buyers, end users, and properties.

133.    Defendants know or reasonably should know that exposure to PFAS is hazardous to the environment and to human health.

134.    Defendants know or reasonably should know that the manner in which they design, manufacture, formulate, market, promote, and sell PFAS and PFAS Products is hazardous to human health and to the environment.

135.    Defendants know or reasonably should know that the manner in which they design, manufacture, formulate, market, promote, and sell PFAS and PFAS Products results in the contamination of the Band's Reservation soil, groundwater, surface water, and other natural resources.

3325458.1

136.    The PFAS Products were in a defective condition unreasonably dangerous to the user when they left Defendants' control, and were expected to and did reach consumers and users without substantial change in the condition in which they were sold.

137.    The defective and unreasonably dangerous condition of the PFAS Products is the direct, sole, and/or proximate cause of the Band's damages as alleged herein and of the imminent, substantial, and impending harm to the Band.

138.    Pursuant to Minn. Stat. § 604.04, the Band provided notice of its claim to Defendants.

139.    The Band seeks compensatory damages in a sum determined by a jury, as well as costs and damages for studies, testing, treatment, mitigation, remediation, and abatement of the PFAS chemicals, medical monitoring and costs to the Band associated with health impacts to Tribal members, and any other relief allowed under law or equity.

**COUNT IV – UNJUST ENRICHMENT**

140.    The Band hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs 1 through 105 as if fully restated herein.

141.    This cause of action is brought pursuant to the laws of Minnesota.

142.    Defendants intentionally, unlawfully, and recklessly design, manufacture, market, distribute, promote, and/or sell PFAS and PFAS Products that Defendants know, or reasonably should know, cause the spread of harmful PFAS contamination to the Band, the Reservation, and the Band's members.

143.    The Band conferred benefits on Defendants by purchasing Defendants' PFAS Products.

144.    Defendants had knowledge of such benefits.

145.    Defendants have been unjustly enriched in retaining the revenues derived from the Band's purchases of PFAS Products.  Retention of those revenues under these circumstances is unjust and inequitable because Defendants misrepresented the safety of PFAS and PFAS Products and/or omitted from consumers that PFAS Products contain dangerously high levels of PFAS chemicals.

146.    Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiff is unjust and inequitable, Defendants must pay restitution to Plaintiff for its unjust enrichment, as ordered by the Court.

## COUNT V – FRAUDULENT TRANSFER (Against the DuPont Defendants) (Minn. Stat. § 513.44)

147.    The Band hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs 1 through 105 as if fully restated herein.

148.    Through the effectuation of a spin off, Chemours and Old DuPont caused Chemours to transfer valuable assets to Old DuPont, including but not limited to a $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

149.    The Transfers and Assumed Liabilities were made for the benefit of Old DuPont.

150.    At the time that the Transfers were made, and the Liabilities were assumed, and until the spin off was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

151.    Old DuPont and Chemours made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors and future creditors of Chemours.

152.    The Band has been harmed because of the conduct of Old DuPont and Chemours.

3325458.1

153.     The Band is entitled to avoid the Transfers and recover property or value transferred to Old DuPont.

**COUNT VI – COST RECOVERY UNDER MERLA (Against 3M) (Minn. ch. 115B)**

154.     The Band hereby repeats, realleges, and reiterates every allegation in the preceding paragraphs 1 through 105 as if fully restated herein.

155.     The 3M Plant, located at 410 E Fillmore Ave, St Paul, MN 55107, and its associated waste disposal facilities, including but not limited to those landfills in which 3M disposed of PFOS, PFOA, and/or other PFAS (which Plant and associated facilities are collectively referred to hereinafter as the "Facilities"), are "facilities" within the meaning of the Minnesota Environmental Response and Liability Act ("MERLA"), Minn. Stat. §§ 115B.01 et seq.

156.     3M owns and/or operates the Facilities and/or owned or operated the Facilities during the times of the release or threatened release of PFOA, PFOS, and other PFAS from the Facilities; and/or arranged for the disposal, treatment or transport for disposal or treatment of waste containing PFOA, PFOS, and/or other PFAS; and/or accepted for transport to a disposal or treatment facility waste containing PFAS that it knew or should have known contained hazardous substances, and selected the facility to which it was to be transported.

157.     EPA considers PFOA, PFOS and/or other PFAS to be hazardous wastes within the meaning of the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6903, which is shown by EPA's proposal to list those PFAS analytes as hazardous constituents. EPA's authority under § 3004(6) of RCRA extends to releases of wastes that meet the statutory definitions of "hazardous waste," defined as "a solid waste. . . which because of its quantity, concentration, or physical, chemical, or infectious characteristics may . . . pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).  PFOA, PFOS, and/or other PFAS

- 46 -

constitute "hazardous waste" and thus "hazardous substances" within the meaning of MERLA, *see* Minn. Stat. § 115B.02 subd. 9.

158.    At times material to this Complaint, 3M owned and/or possessed the PFOA, PFOS, and/or other PFAS and arranged for the disposal, treatment, and/or transport for disposal and/or treatment of the PFOA, PFOS and PFAS.

159.    At times material to this Complaint, there have been releases and/or threatened releases of PFOA, PFOS, and other PFAS from 3M and/or releases otherwise attributable to 3M and/or under 3M's control, related to 3M's operations, releases related to incineration and/or other on-site disposal, and releases related to off-site disposal at area landfills.

160.    At times material to this Complaint, 3M is and has been responsible for the releases and/or threatened releases of PFOA, PFOS and/or other PFAS described above.

161.    The releases and/or threatened releases of PFOA, PFOS and/or other PFAS have caused and will cause the Band to suffer some or all of the following damages for which 3M is liable, *see* Minn. Stat. §§ 115B.04-05:

a. Physical injury to its Tribal members, including but not necessarily limited to PFAS blood/bodily contamination, both temporary and permanent;

b. Property damage, both temporary and permanent;

c. Natural resource damages; and

g. Other damages, which, under the law and circumstances, the Band is entitled to recover.

162.    3M is strictly liable to the Band for those damages that the Band has incured and will incur.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Leech Lake Band of Ojibwe respectfully requests that the Court enter judgment against Defendants, individually, jointly, and severally, and requests the following

relief:

     a.    A jury trial and finding or declaration that Defendants engaged in tortious conduct, including nuisance, negligence, product liability, unjust enrichment, fraudulent transfer, and/or deliberate disregard for the health, safety, property, and culturally significant values of the Band;

     b.    An award to the Band for general, compensatory, consequential, and incidental damages;

     c.    An award of attorney fees and costs, as provided by law;

     d.    An award of pre-judgment and post-judgment interest as provided by law;

     e.    Equitable or injunctive relief;

     f.    Compensatory damages according to proof including, but not limited to:

         i.    Costs associated with testing drinking water and natural resources;

         ii.    Costs associated with the treatment, mitigation, remediation, and abatement of PFAS contamination in groundwater and surface water;

         iii.    Costs associated with treating drinking water contaminated with PFAS;

         iv.    Costs associated with the treatment, mitigation, remediation, and abatement of PFAS contamination of soil, crops, fish, wildlife, and other natural resources;

         v.    Costs associated with restoration of Tribal lakes and fisheries;

         vi.    Costs associated with providing bottled water to the Bug-O-Nay-Ge-Shig School Community and drilling a new well for the school;

vii.    Medical monitoring and other health costs of Tribal members for injuries associated with PFAS exposure;

viii.    Costs associated with the increased costs of healthcare services provided by the Band attributable to the health impacts of PFAS contamination and exposure;

ix.    Diminution of property value caused by PFAS contamination;

x.    Damages to the Band's cultural resources caused by PFAS contamination;

xi.    Loss of profits to the Band from agriculture and tourism caused by PFAS contamination;

g.    An award of restitution in an amount sufficient to restore the Band's Reservation to pre-contamination status.

h.    An order barring transfer of DuPont's liabilities for the claims brought in this Complaint; and

i.    An order for all such other relief the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on issues so triable.

Dated: September 25, 2025        Respectfully submitted,

- 49 -

By:     /s/      Dan Drachler
        Dan Drachler

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
Elizabeth J. Cabraser (*pro hac vice*
forthcoming)
Eric B. Fastiff (*pro hac vice* forthcoming)
Dan Drachler (State Bar # 0205849)
Robert J. Nelson (*pro hac vice* forthcoming)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
ecabraser@lchb.com
efastiff@lchb.com
ddrachler@lchb.com
rnelson@lchb.com

Emily N. Harwell (*pro hac vice* forthcoming)
250 Hudson Street, 8th Floor
New York City, NY  10013
Telephone: (212) 355-9500
eharwell@lchb.com

**SONOSKY, CHAMBERS, SACHSE,
ENDRESON & PERRY LLP**

Frank S. Holleman (*pro hac vice* forthcoming)
1425 K St NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-0240
fholleman@sonosky.com

K. Amanda Saunders (*pro hac vice*
forthcoming)
510 L Street, Suite 310
Anchorage, AK 99501
Telephone: (907) 258-6377
amandas@sonosky.net

3325458.1

Filed in District Court
State of Minnesota
9/25/2025 3:31 PM

**LEECH LAKE BAND OF OJIBWE**

Christopher Murray (State Bar # 0401028)
190 Salistar Drive NE
Cass Lake, MN 56633
Telephone: (218) 335-3673
christopher.murray@llojibwe.net
Ralph Overholt (State Bar # 0212404)
Telephone: (218) 407-7229
ralph.overholt@llojibwe.net

*Attorneys for Plaintiff*

3325458.1